Satterwhite, Appellant, *v.* National Powder
Company.

Argued April 13, 1949. Before MAXEY, C. J., DREW,
LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Wm. D. Gallup,* with him *F. D. Gallup, E. G. Potter* and *Gallup, Potter & Gallup,* for appellant.

*Joseph P. Willson,* with him *F. J. Woods* and *James C. Bly,* for appellee.

OPINION BY MR. JUSTICE LINN, May 23, 1949:

The jury rejected plaintiff's contention that there was a breach of his contract with defendant by returning a verdict against him. He appeals and alleges error (1) in the refusal of his motion for judgment n. o. v. (2) in the refusal of his motion for a new trial, and (3) in rulings on evidence.

Defendant, in McKean County, Pennsylvania, was engaged in the manufacture of dynamite, and, on June 29, 1940, made the contract with plaintiff involved in this suit. Defendant was described as "seller" and the plaintiff as "buyer." Their contract dealt with two classes of orders; those "for domestic business" and those "for export." Paragraph III provided in part: "Seller hereby grants Buyer the exclusive right to sell the explosives of Seller in the Export trade. All of sales of Buyer for export to be subject to all conditions and terms of this contract. Seller also grants Buyer the right to sell its products in the United States [with exceptions not now material] . . . Buyer also covenants and agrees to refrain from soliciting and selling any

individuals, partnerships, firms or corporations which Seller is now or in the future soliciting for business and Seller agrees to refrain from soliciting anyone being solicited or sold by Buyer. . . ."

The contract period was two years with an automatic renewal provision for one year periods until either party gave notice of termination. While the parties used the terms "buyer" and "seller," they appear to have regarded the contract as one employing plaintiff as selling agent on a commission basis. In the spring and summer of 1940, through plaintiff's agency, and before this contract was executed, defendant made a sale of explosives to the British Purchasing Commission. A second sale was made after the contract between plaintiff and defendant was executed. After the passage of the Lend-Lease [1] and First War Powers [2] Acts the British Purchasing Commissions made no private contracts for the purchase of munitions and explosives. For the two sales made to the British Purchasing Commission the plaintiff was paid.

In ascertaining the meaning of the words of the parties "a familiar rule of construction is that a contract will be construed in the light of the subject-matter and conditions existing at the time of its execution and that it comprehends only those things in respect to which it appears the parties proposed to contract and its provisions will not be extended to cover others apparently not thought of or intended to be included . . ." *Silverthorn v. Silverthorn*, 276 Pa. 579, 120 A. 656 (1923) ; *Portage Mercantile Co. v. Johnstown Coal & Coke Co.*, 356 Pa. 557, 52 A. 2d 452 (1947). We must assume that when they made their contract, they were considering "export trade" in its commonly understood commercial sense; the United States was not then at war; the parties did not consider that defendant's only product would be

---

[1] Act of March 11, 1941, c. 11, 55 Stat. 31, 22 U. S. C. A. 411.

[2] Act of December 18, 1941, c. 593, 55 Stat. 838, 50 U. S. C. A. 601.

taken out of commercial trading by the necessities of national defense; we say they did not consider it because, if they had, they would have expressed their agreement with respect to it.

An important change in the contractual relations of the parties was made by the enactment of the Lend-Lease Act, "further to promote the defense of the United States." By that Act, defendant's product became a "defense article." The President was empowered to authorize the War Department "to sell, transfer title to, exchange, lease, lend or otherwise dispose of, to any such government, any defense article . . ." Sub paragraph (b) provided: "The terms and conditions upon which any such foreign government receives any aid authorized under subsection (a) shall be those which the President deems satisfactory, and the benefit to the United States may be payment or repayment in kind or property, or any other direct or indirect benefit which the President deems satisfactory." Under that Act and also under the First War Powers Act the President issued, inter alia, executive orders numbered respectively 8926 and 9001, establishing the Office of Lend Lease Administration and authorizing the War Department to contract for war materials: Cumulative Supplement to Code of Federal Regulations, p. 1018 and p. 1054.

On January 17, 1942, the United States being then engaged in the war, the defendant, in response to the government's invitation to bid, submitted a bid which was accepted by the War Department at Pittsburgh, Pennsylvania. Between that date and October, 1942, three other similar sales were made by the defendant to the United States. Plaintiff claims commissions on those four sales. Delivery under the contracts, which in plaintiff's brief are referred to as "The United States Ordnance Contracts," was taken by the government at defendant's factory at Eldred, Pennsylvania. The product was paid for by the United States Treasury and defend-

ant had nothing more to do with it. We assume that the subject of the first two sales (identified as "lend-lease requisition No. 7865") was sent to England; the third was marked, "P. W. D. Kingston, Jamaica;" the fourth was marked for Russia and contained a reference to the First War Powers Act. The parties agreed that the amount due plaintiff, if anything, was $109,628 with interest.

I. We must accept the oral evidence supporting the verdict for the defendant and reject contrary inferences: *Pantuso et al. v. Pittsburgh Motor Coach Co.*, 360 Pa. 464, 62 A. 2d 56 (1948). Plaintiff's first proposition is that as the contracts were made with the government, which shipped the "defense article" to Europe, he is entitled to judgment n. o. v. on the ground that the sales were in the "export trade." The second is that, if considered domestic and not export business, he is entitled to payment under provision III of the contract as a prior solicitor of the Ordnance Department's business.

First. The learned trial judge allowed the jury to find whether the sales were in the export trade. We need not consider whether the joint action of Congress and the President [3] rendered it impossible for defendant to make such sales for export [4] because the undisputed

---

[3] See Act of October 6, 1917, c. 83, as amended by Act of December 26, 1941, c. 633, 55 Stat. 863 et seq., 50 U. S. C. A. 121 et seq. governing manufacture, distribution, etc., of explosives. Also Act of July 2, 1940, c. 508, sec. 6, 54 Stat. 714, 50 U. S. C. A. 701, authorizing the President to curtail the exportation of certain articles. Under this latter Act the President on July 2, 1940, issued Proclamation 2413, Code of Federal Reg., Cum. Supp. 1-3, page 164, requiring licenses for exportation. See also Regulation of July 2, 1940, Code of Fed. Reg., Cum. Supp. 1-3, page 1310.

[4] As to which see Restatement, Contracts, section 458; Williston, Contracts, Vol. VI, sections 1938, 1939; Schroeder, The Impact of the War on Private Contracts, 42 Mich. L. Rev. 603 (1944); Conlen, The Doctrine of Frustration as Applied to Contracts, 70 U. of Pa. L. Rev. 87 (1922).

evidence is to the effect that the four sales to the United States Ordnance Department were domestic sales and the learned trial judge might so have instructed the jury. But as the verdict was for the defendant, the error did no harm. Defendant was not engaged in export trade in making these sales to the Ordnance Department. The plaintiff assumes that what the Ordnance Department did with the product after acquiring it, determines its export character within the terms of the contract between the parties. This assumption is erroneous. The Ordnance Department bought and took delivery of the explosives and paid for them and of course had an owner's right to dispose of them. Whether they would be shipped abroad or be used in the United States were transactions in which defendant had no voice. The Ordnance Department was not a transportation agent; there was no agreement between defendant and any foreign government to whom the goods may have have been shipped by the United States. There is no evidence that sending the goods abroad was a trade transaction; the evidence is the other way; it is undisputed that these were transactions in the national defense. It does not appear whether the Ordnance Department sold, leased, or gave away the property. The contract was not ambiguous; plaintiff was to be the defendant's exclusive agent for the purpose of negotiating export contracts. He does not suggest that defendant, by dealing with the Ordnance Department, sought to avoid the effects of its contract with him. Having sold and delivered its product, in good faith, to a domestic purchaser the defendant did not become engaged in export trade because it knew or might have known that its domestic purchaser might or would send these goods abroad under "lend-lease" or other legislation providing for national defense.

Second. The plaintiff is in no better position in his effort to claim compensation under the second part of

provision III because there is abundant evidence that in 1940 and 1941, the defendant solicited the United States as a possible purchaser, while, on the other hand, the evidence is that the plaintiff's effort was made in January, 1942. As this evidence was oral, it was necessarily submitted to the jury: *Nanty-Glo Boro v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932). There is no ground therefore on which plaintiff's motion for judgment n. o. v. could have been granted.

II. We can find no support in the record for plaintiff's contention that a new trial should have been awarded. The principal reason stressed is the exclusion of certain paragraphs of the complaint proposed to be read in evidence as admissions insufficiently denied in the Answer. We have examined the subject in the light of the arguments and agree with the conclusions sufficiently stated in the opinion of the court refusing the new trial. As the plaintiff alleged in paragraph I of the complaint that he had at all times been trading under a specified fictitious name duly registered under the statute, we think the court acted within its discretionary power in overruling the objection to the question on that subject (which was never answered) the exclusion of which was the basis of the 9th assignment of error.

Judgment affirmed.